UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 22 CR 156 |
| v. | ) | |
| | ) | Hon. Sharon J. Coleman |
| DRAKE BOOKER | ) | |
| | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, hereby respectfully submits the Government's Sentencing Memorandum, and asks this Court to sentence the defendant to no less than 87 months' imprisonment.

## I.     Background

Defendant was a core member of a violent kidnapping and robbery crew that posed as law enforcement officers to facilitate the kidnapping and ransoming of drug dealers, and the robbery of drug stash houses across Chicago. Defendant's crew specifically targeted drug dealers believed to be in possession or control of large quantities of cash, illegal drugs, and other valuables that defendant's crew sought to obtain for themselves. The crew posed as police officers—including dressing in suits and/or ballistic vests with law enforcement insignia, and using handcuffs, badges, and radios—to make the kidnappings falsely appear to be lawful arrests (so the victims would not resist, and members of the public would not report the abductions).

In the summer of 2018, Booker and his crewmembers began planning to kidnap a local drug dealer (Victim 1). In preparation, and to confirm that Victim 1 was still actively selling drugs (and therefore would be a worthwhile kidnapping target), Booker provided money to an associate and directed him to purchase heroin from Victim 1, which the associate did. *See* Ayers G.J. Transcript, 18-19. After confirming that Victim 1 was still actively selling drugs, Booker and his crewmembers began plotting the abduction. Booker obtained a black Lincoln Navigator from his brother—who worked for a local rideshare company—to use during the abduction. To strengthen their impersonation of law enforcement officers during the kidnapping, Booker dressed in a suit and his co-conspirator, Individual A, wore a police ballistics vest. Booker also carried handcuffs, a radio, and a fake law enforcement badge. Booker and his crewmembers decided to carry out the kidnapping on August 23, 2018, outside of a restaurant that Victim 1 owned on Chicago's southside.

On August 23, 2018, Booker and Individual A traveled to the area of East 75th Street and Dorchester Avenue in the black Navigator. Video surveillance shows Booker and Individual A stalking Victim 1 outside of his restaurant, waiting for him to lock up and leave for the night. At approximately 7:48 p.m., Victim 1 exited his restaurant and walked north on Dorchester Avenue. Booker, who was driving the Navigator, followed Victim 1. As Victim 1 approached his personal vehicle, Booker pulled the Navigator alongside Victim 1 and his vehicle, exited the Navigator, and carried out the kidnapping.

Specifically, Booker announced himself as a law enforcement officer, showed Victim 1 a fake law enforcement badge, and ordered Victim 1 to stop. Victim 1—believing Booker to be a police officer—complied, at which point Booker pushed Victim 2 against his vehicle and handcuffed him, photos of which are below:





Once Victim 1 was handcuffed, Booker led him over to the Navigator and forced him into the backseat, as Individual A (wearing a police ballistics vest) came around to assist:



Once inside the vehicle, Individual A forced two cloth hoods over Victim 1's head (Booker's DNA was later recovered on one of the hoods) and Booker (who was driving) and Individual A transported Victim 1 against his will from the 7400 block of Dorchester Avenue to the 6300 block of South Greenwood Avenue. Booker and Individual A had a police scanner inside the Navigator that they were using to monitor police radio traffic. During the drive, a police broadcast came across the scanner regarding Victim 1's abduction, which included a description of the Navigator. At that point, Booker began speeding through backroads and alleyways and shortly thereafter terminated the kidnapping by forcing Victim 1 out of the Navigator in an alleyway approximately two miles north of the kidnapping site. If not

for the police radio broadcast, Booker, Individual A, and their co-conspirators would have held Victim 1 in captivity until he paid a hefty ransom.

The record contains substantial evidence of several other serious crimes that Booker committed as part of his membership in the same kidnapping/robbery crew. Ivan Ayers—a longtime associate of Booker—provided detailed sworn testimony about Booker's yearslong involvement in kidnapping/robbery crew, which included planning other robberies and kidnappings directly with Ayers. Ayers' testimony was corroborated by substantial independent evidence, including text message conversations from October and November 2019 between Ayers and defendant in which they planned additional kidnappings and robberies and exchanged photographs of potential targets. *See* PSR, 169-181.

Ayers also provided a screenshot photograph he took of Booker during a Facetime conversation in or around 2018 in which Booker was displaying to Ayers and other co-conspirators the spoils of a recent robbery in which he had participated:



Below is a photograph of Booker and several members of his kidnapping/robbery crew at a "Tuxedo Party" at a club on the southside of Chicago that members of the crew frequented (Booker is circled. It should be noted that this

and the above photograph were taken at the time that, according to Booker, he was homeless and desperate for money to support his children):



## II.    The Government's Position on Sentencing

The district court must properly calculate the guidelines range, treat the guidelines as advisory, consider the § 3553(a) factors, and adequately explain the chosen sentence, including an explanation for any variance from the guidelines range. *See Gall v. United States*, 552 U.S. 38, 49-50 (2007).  The sentence imposed must be "sufficient, but not greater than necessary," to comply with the purposes of sentencing provided under 18 U.S.C. § 3553(a)(2).

### A.    The PSR

The government agrees with the guidelines calculation contained in the PSR. Defendants is a total offense level of 29 and a criminal history category of I, leading to an advisory guideline range of 87-108 months' imprisonment.

### B.    The 3553(a) Factors

#### i.    *Nature and Circumstances of the Offense*

The offense of conviction was a violent, premeditated offense. It was just one episode in a much larger and long-running kidnapping and robbery conspiracy that posed an enormous danger to the victims and the public. The guidelines do not capture several of the most aggravating factors associated with this case, including defendant's involvement in other robberies and kidnappings, or the sophistication and egregiousness of posing as law enforcement officers to carry out abductions in broad daylight. These aggravating factors make a below-guideline sentence inappropriate.

ii.     *History and Characteristics of the Defendant*

There is little in defendant's background that provides meaningful mitigating context to his crimes. Although defendant had a difficult childhood, he appears to have thrived in high school and earned an athletic scholarship to a four-year undergraduate university. PSR, ¶¶ 85-86. Although defendant dropped out of university after one-year, that appears to have been due to a personal situation and general immaturity, not because of any childhood trauma.

In or around 2003, defendant enlisted in the Army and served in combat in Iraq. Defendant's service in combat ended no later than late 2003. *See* R. 51 (Dr. Farmilant Report), 6 ("I got back from Iraq in late 2003. There was no combat after that."). Over the next 11 years, defendant had what can only be described as a stellar career in the military, rising to the rank of captain and consistently drawing the highest praise from his superior officers. *See* R. 50, Def. Sen. Mem. Exhibit C. Defendant's military career ended in 2014 following what appears to be an incident in which defendant used a military fuel card to purchase hundreds of dollars of fuel for himself. Defendant admitted to the conduct once confronted and accepted the option to resign from military service rather than face disciplinary proceedings. In the government's view, for sentencing mitigation purposes, this incident should not significantly detract from defendant's otherwise honorable and outstanding military service.

Defendant obtained his bachelor's degree in 2007. PSR ¶ 87. Between 2016 and 2019—a period in which defendant claims he was homeless—defendant enrolled in

various graduate study programs at Northeastern University and the University of Chicago. PSR ¶¶

Defendant's educational achievements and extraordinary success in the military presented him with opportunities that are unavailable to many defendants who come before this Court. Despite these opportunities, defendant chose to turn to violent crime to support himself and went on to unleash mayhem across Chicago with his fellow crewmembers.

Defendant has submitted a psychological evaluation report by Dr. Steven Farmilant, a psychologist hired by the defense for purposes of sentencing mitigation. The report concludes that the defendant suffers from PTSD due to a "lifelong history of traumatic experiences," most significantly his combat experience in Iraq, and that the criminal conduct in this case was a "product of" those experiences, as well as related depression, anxiety, and alcoholism. R. 51, 10.

While the government does not here challenge defendant's underlying PTSD diagnsois, Dr. Farmilant's conclusions that the offense conduct was a "product" of the PTSD is objectively unreliable, and the Court should not give it significant weight. Specifically:

- Dr. Farmilant has no specialized training or certifications in PTSD. He has never published or taught on PTSD. Neither Dr. Farmilant's C.V. nor his website states that he has any type of expertise in PTSD.

- Dr. Farmilant did not review any relevant medical or military records in preparing his report, other than a 2021 VA benefits letter. Dr. Farmilant did not speak to anyone other than the defendant (twice) and his current or former family members (he did not even speak to defendant's therapist).

- Dr. Farmilant did not review any court records or evidence in this case prior to preparing his report. Rather, he relied on the defendant and defense counsel to explain the offense conduct. Unfortunately, Dr. Farmilant was not provided with a complete explanation of the offense conduct. For example, Dr. Farmilant did not know that: (1) defendant was a member of a kidnapping/robbery crew (Dr. Farmilant apparently believed defendant committed the crime on his own); (2) defendant and his accomplice impersonated law enforcement officers during the charged kidnapping; (3) defendant engaged in intricate and long-term planning in preparation for the offense, including sending someone to purchase drugs from the victim to make sure he was still actively dealing, and obtaining the vehicle used in the offense from his brother, who worked for a rideshare company; and (4) substantial evidence exists showing that defendant participated in other robberies and kidnappings. **Obviously, Dr. Farmilant cannot reliably opine on what caused defendant's criminal behavior if he does not accurately understand the behavior itself.**

- There is no evidence—medical or otherwise—that the presence of PTSD inherently predisposes someone to commit crime. As a matter of common sense, that is particularly so for complex, premeditated crimes such as this one (as opposed to a reactive or impulsive crime).

- Dr. Farmilant's report utterly fails to account for the 11-year positive trajectory that defendant experienced *after* his combat experience in 2003. Specifically, between 2003 and 2014, defendant steadily rose through the Army's leadership ranks while regularly exhibiting behavior that is simply not consistent with PTSD. *See, e.g.*, Def. Sen. Mem., Exhibit C, 15 ("With just over a year of 'captain's time,' Drake's performance easily rivals that of much more experienced Captains. There is literally no task he cannot handle".) Throughout this time, defendant's commanding officers consistently rated him as demonstrating high-functioning mental, emotional, interpersonal, planning, decision-making, and execution skills (*e.g.*, "Displays self-control and calm under pressure," "Employes sound judgement, logical reasoning, and uses resources wisely," "shows skills with people, coaching, teaching, counseling, motivating, and empowering"). Defendant's behavior and trajectory between 2004 and 2014, as thoroughly documented in his contemporaneous military records, is totally at odds with the DSM-V Diagnostic Criteria for PTSD, which include avoidance, persistent negative emotional state, markedly diminished interest or participation in significant activities, irritable behavior, difficulty concentrating, and feelings of detachment from others.

- Dr. Farmilant's conclusions appear to be based largely on psychological test results which purportedly show that defendant has unusually low levels of psychological functioning in 2023 (at the time Dr. Farmilant examined him). However, Dr. Farmilant fails to reconcile these test results with several objective factors that indicate that defendant has a perfectly normal (if not high) level of psychological functioning, including: (1) defendant has had consistent full-time employment for at least six years, PSR ¶¶ 91-92; (2) defendant is actively working towards a master's degree from DeVry University (this fact is omitted entirely from Farmilant's report), PSR ¶ 89; (3) defendant purchased a home in July 2021 and has had no apparent difficulties making his mortgage payments, PSR ¶¶ 97-98; (4) defendant is an actively involved father of three boys, with whom he enjoys "amazing" relationships. PSR ¶ 68.

- Dr. Farmilant has an obvious personal bias toward the defendant. R. 50, 11 ("Thank you for the opportunity to evaluate this remarkable man").

To conclude, the government respects the defendant's military service and appreciates the debilitating psychological effects that combat can have on soldiers. However, there is simply no reliable basis to believe that any combat-related trauma that defendant suffered in 2003 was a meaningful causal factor behind his decision 15 years later to dress up as a police officer so that he could kidnap a drug dealer and attempt to hold him for ransom. That is simply a bridge too far and the Court should not go along with it.

iii. *3553(a)(2) Factors*

From the government's perspective, the most compelling 3553(a)(2) factors in this case are specific and general deterrence, promotion of respect for the law, and punishment. There are few things society has a stronger interest in deterring than violent kidnappings. Further, defendant's impersonation of a law enforcement officer

during the abduction exhibited a shocking level of disrespect for the law that demands severe punishment.

### C. Mandatory Restitution

As a violent crime, this case triggers the Mandatory Victim Restitution Act (MVRA). 18 U.S.C. § 3663A. However, despite several efforts to contact Victim 1 through his counsel to determine what damages or losses he may have suffered "directly or proximately" as a result of the offense, the government has been unable to obtain any such information. As a result, the government is not asking the Court to impose restitution in this case.

### D. Supervised Release

The government concurs with Probation's recommendation of a 4-year term of supervised release. The government also agrees with all recommended conditions, which are all supported by the 3553(a) factors and will help ensure effective supervision.

### Conclusion

For the reasons set out above, the government respectfully asks this Court to impose a sentence of 87 months' imprisonment followed by 4 years of supervised release.

Respectfully Submitted,

MORRIS PASQUAL
Acting United States Attorney

By:      /s/ Sean J.B. Franzblau
Sean J.B. Franzblau
Assistant United States Attorney

14