IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,            )    No. 22 CR 156
                                     )
                Plaintiff,           )
                                     )
        v.                           )    Chicago, Illinois
                                     )    November 1, 2024
DRAKE BOOKER,                        )    11:06 a.m.
                                     )
                Defendant.           )    Sentencing Hearing

                TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SHARON JOHNSON COLEMAN


APPEARANCES:

For the Government:      HON. MORRIS PASQUAL,
                         Acting United States Attorney, by
                         MS. STEPHANIE C. STERN,
                         Assistant United States Attorney
                         219 South Dearborn Street
                         Suite 500
                         Chicago, Illinois  60604

For the Defendant:       LAW OFFICES OF STEVEN R. DECKER
                         900 West Jackson Boulevard
                         5E
                         Chicago, Illinois  60607
                         BY:  MR. STEVEN R. DECKER

                         ARI WILLIAMS LAW
                         2150 South Canalport Avenue
                         Chicago, Illinois  60608
                         BY:  MS. ARIELLE WILLIAMS


U.S. PROBATION:          MS. MELISSA RAY



             TRACEY DANA McCULLOUGH, CSR, RPR
                  Official Court Reporter
                219 South Dearborn Street
                       Room 1232
               Chicago, Illinois  60604
                    (312) 435-5570

(Proceedings held in open court:)

THE CLERK:  22 CR 156, USA versus Drake Booker.

MS. STERN:  Stephanie Stern on behalf of the United States.  Good morning.

THE COURT:  Good morning, Miss Stern.

MR. DECKER:  Good morning, Your Honor.  Steven Decker, one of the lawyers on behalf of Drake Booker.

THE COURT:  Thank you.

MS. WILLIAMS:  Judge, good morning.  Ari Williams on behalf of Mr. Booker.

THE COURT:  All right.  And we have Mr. Booker.  Please stand.

DEFENDANT BOOKER:  Hi.  Good morning, Your Honor.

THE COURT:  Good morning.  All right.  Thank you.  All right.  And as you know, the people in the courtroom don't know, I took over this case from my late colleague, and I have all the information that he would have had in front of him to take this case over.

Are there any objections to that situation, government?

MS. STERN:  No, Your Honor.

THE COURT:  Any objections from the defense?

MR. DECKER:  None whatsoever, Your Honor.

THE COURT:  All right.  Probation, can you please state your name.

MS. RAY: Good morning, Your Honor. Melissa Ray on behalf of Probation. I'm standing in for Danielle Stern.

THE COURT: All right. Thank you very much for being here. And I know you also have all the information that you need to do your job as Probation here today.

Is everyone ready for sentencing? Government?

MS. STERN: Yes, Your Honor.

THE COURT: Defense.

MS. WILLIAMS: Yes, Your Honor.

MR. DECKER: The defense is ready.

THE COURT: All right. Good. So, Mr. Booker, since you are not in my room from the beginning, I am going to repeat something that I usually tell anyone who's before me who either pleads guilty or is found guilty. And that is, at this point of sentencing it is my job to make sure that I have as much information as I can have in front of me before I go forward with the sentencing. And that I look forward to getting that information from the government, from your lawyers, from Probation, from whoever you want to present information on your behalf. Because I want to be able to not only look at the charge, which I do have in front of me, but also look at everything about you so that I can sentence you in a sufficient way, but not greater than necessary.

Do you understand?

DEFENDANT BOOKER: Yes, Your Honor, I do.

THE COURT:  All right.  And you can stay seated. Just stay seated right now.  And so I take all that into consideration.  I'm going to hear arguments on top of all the writings that I have gotten.  I have looked at all the letters. You have quite a few.  I have looked at the photos and the certificates and all of that.  I've seen all of that.  I also will listen to the arguments that are presented.

There are factors called sentencing factors that I take into consideration, and I'll go through those also today. And I look at all of this, again, so that I sentence you based on all of the factors, the law that's before me, the sentencing guidelines, and then I reach a decision.  Do you understand?

DEFENDANT BOOKER:  Yes, Your Honor.

THE COURT:  All right.  And so I will begin with, first of all, there's a presentence investigation report that was put together in your case, and a supplement report.  And I assume that you have seen those, is that correct?

DEFENDANT BOOKER:  It is, Your Honor.

THE COURT:  All right.  You were able to go over those with your lawyer?

DEFENDANT BOOKER:  Yes.

THE COURT:  All right.  And, government, you also have it, correct?

MS. STERN:  Yes, Your Honor.

THE COURT:  All right.  Do both sides also have

copies of the sentencing recommendation?  Have you seen that?

DEFENDANT BOOKER:  Yes, Your Honor.

THE COURT:  All right.  The government also has it.

MS. STERN:  Yes, Your Honor.

THE COURT:  All right.  Good.  All right.  So I'm going to ask at this point are there objections that the defendant wishes to bring up regarding the presentence investigation report?

MR. DECKER:  Judge, we have no objection to the --

THE COURT:  Calculations?

MR. DECKER:  -- conclusions in the report.

THE COURT:  All right.  Thank you.  Any objections from the government?

MS. STERN:  The government just objects to the conclusion regarding the guideline -- proposed guideline range and the application of 5(k)2.13.

THE COURT:  So you object to the guideline range or to the recommendation?

MS. STERN:  The recommendation --

THE COURT:  The sentencing recommendation?

MS. STERN:  Correct.

THE COURT:  So right now what I have here in front of me, and somebody correct me if I'm wrong, first of all, based on the offense level on this case, the offense charged, that I have a 29 offense level, criminal history category of 1.  And

are you objecting to that?

MS. STERN:  No, Your Honor.

THE COURT:  All right.  And so based on that, sir, we have statutory provisions based on the crime that you were convicted of committing.  If I was to apply the law, the statute as it is, without guidelines calculations, without the Sentencing Commission, it would be zero years to life in custody.  Supervised release would be zero to five years.  You would be ineligible for probation.  A fine of $250,000, and then a special assessment of a hundred dollars.  That's if I followed the statute, the law, without any consideration to the guideline -- the Commission guidelines.

So there's this other section, which I sort of alluded to, where there's a Sentencing Commission, United States Sentencing Commission that's appointed by the President of the United States.  And all kinds of people from parts of the judicial system, the criminal justice system, whether they're defense attorneys, prosecutors, judges, professors, probation people, they all get together on a regular basis, combine their expertise and their opinions and help arrange for sentencing ranges, and weigh in on the law as it's set forth to deal with sentencing issues.  So that when you come into a courtroom, Judge Leinenweber would have had the same stuff in front of him.  I have it in front of me.  Any federal judge will have the same situation in front of us based on the

presentence investigation report, the calculations there. Again, the offense level of 29 with a criminal history category of 1.

Every judge -- federal Judge would be looking at it in the same way.  And the way it's set up with the guideline provisions right now based on the Sentencing Commission and the guidelines is 87 months to 108 months, as opposed to the zero to life range.  Do you understand?

DEFENDANT BOOKER:  Yes, Your Honor.

THE COURT:  All right.  And so, again, there's no objection to the provisions stating what I just stated, 87 months to 108 months.  That being the range that I start at, correct, defense?

MS. WILLIAMS:  No objection.

MR. DECKER:  No.

THE COURT:  No --

MR. DECKER:  That is correct, Your Honor.

THE COURT:  All right.  And so, again, that's a range, sir.  Based on that range, I can go within the range.  I can go above the range.  I can go below the range.  Do you understand?

DEFENDANT BOOKER:  Yes, Your Honor.

THE COURT:  All right.  That's what these arguments in writing and orally and all of the papers that you filed are going to assist me with.  Okay?

DEFENDANT BOOKER:  Yes, ma'am.

THE COURT:  All right.  So that's where we are.  And again, the 87 to 108 months of custody, 2 to 5 years supervised release after you're released from custody.  Instead of a $250,000 fine, it's a $30,000 to $250,000 range and still the hundred dollar special assessment.  That is the guideline provisions.  And everyone is aware that the recommended sentence by Probation based on their expertise and based on all their calculations is a recommended sentence of 40 months.  That is under the guidelines.  That's half -- more than halfway under the lowest part of the guidelines.  And they recommend supervised release for four years and a hundred dollar special assessment.  Is that correct, Probation?

MS. RAY:  It is, Your Honor.

THE COURT:  And that is what the government is going to be arguing against in a moment, is that correct, government?

MS. STERN:  Yes, Your Honor.

THE COURT:  All right.  So with that, if there's nothing else before we get to that, I'm going to start the presentation by the government as to what they recommend or feel is appropriate in this case.  Anytime you're ready, Miss Stern, you can approach the podium.  Thank you.

MS. STERN:  Thank you, Your Honor.  As you just stated, the parties do not disagree about the guideline calculation, and so there's agreement there.  And the Court

next turned to the Section 3553(a) factors in assessing the appropriate sentence for defendant.

The government's position is in taking into account the guideline range and the Section 3553(a) factors, a sentence at the low end of the guidelines range, and specifically 87 months, sufficiently accounts for the seriousness of this offense, while also accounting for the mitigating factors related to defendant's personal characteristics.

First, so turning to the 3553(a) factors. The first is the nature and circumstances of the offense here. Defendant was a core member of a kidnapping and robbery crew that posed as law enforcement officers to facilitate the kidnapping and ransoming of drug dealers and the robbery of drug stash houses. Defendant's crew targeted drug dealers they believed had large amounts of cash or drugs. The crew would pose as police officers to make the kidnappings appear to be lawful arrests. Thereby minimizing bystander involvement and resistance from their victims.

Specifically in the summer of 2018, defendant and his crew members began planning to kidnap a local drug dealer named Charles Lawrence. The planning of this kidnapping was detailed, and defendant specifically was intimately involved in this detailed planning. This included defendant providing money to an associate beforehand and directing this associate to purchase heroin from the victim, so the crew could confirm

that the victim was still selling drugs.

Defendant himself obtained a black Lincoln Navigator from his brother to use during the abduction, and defendant coordinated with his co-conspirator to ensure that they were both -- they both looked like law enforcement, including defendant wearing a suit, obtaining handcuffs and a radio and a fake law enforcement badge, and his co-conspirator wearing a police ballistics vest.

On the day of the kidnapping on August 28th, 2018, defendant and his co-conspirators stalked the victim outside of his restaurant, and at approximately 7:48 p.m. defendant pulled his Navigator next to the victim, got out, announced himself as law enforcement, showed his fake badge, and ordered the victim to stop. Defendant then pushed the victim against the victim's car, handcuffed him, led him back to the Navigator, and put the victim in the back seat.

Once in the car, the co-conspirator put cloth hoods over the victim's head, and defendant started driving away. While defendant was driving, he had his police scanner on and heard a police broadcast come across regarding the abduction. Defendant decided to end the kidnapping after he heard the broadcast and dropped the victim off in an alley.

Notably this premeditated kidnapping was not an isolated incident. The evidence indicates that defendant was involved in the kidnapping crew before the kidnapping of this

victim and continued to be involved in this crew afterwards through 2019. Indeed in 2018 and 2019 defendant continued to plan additional kidnappings and robberies and bragged about the spoils of his crime.

This is all to demonstrate the defendant's conduct related to this particular offense was not a one-off instance of bad judgment made in the spur of the moment. It was highly planned and premeditated, and it was part of a larger pattern of dangerous and violent conduct.

The second assessment the Court makes is related to the history and characteristics of the defendant. And this I think is really the core issue between the parties. The government acknowledges that defendant has numerous mitigating circumstances that are evidenced in his filing. He is a veteran. He's a combat veteran, and he has PTSD. These are all mitigating factors. In addition to the numerous character letters, obviously familial and support from his community.

While defendant's history and characteristics are mitigating, the government strongly disagrees that this diminishes the overall offense conduct or diminishes -- or that he had a diminished mental capacity at the time of the offense.

First turning to the Probation and defense -- defendant's consideration of guideline 5(k)2.13. The government notes this is -- the guidelines are advisory, and so the Court could depart from the guidelines under the 3553(a)

factors at any time. However, because they pointed to this 5(k)2.13 guideline as a basis for departing from the guidelines, I'll just address that briefly. Under this guideline, which is a diminished capacity guideline, it states that it does not apply if the facts of the offense suggest a need to protect the public from defendant because the offense involved actual violence.

Here defendant committed a kidnapping, which is a violent crime, and moreover, appears to have been -- this just appears to have been one in a string of violent kidnappings and robberies.

THE COURT: Do you have the number? The approximate number, since I wasn't here from the beginning on the case?

MS. STERN: I do not have the approximate number, no.

THE COURT: Are we talking about 2, 5, 10?

MS. STERN: The messages from -- there was a set of messages that defendant sent to one of his co-conspirators in the robberies, as well as testimony from that co-conspirator related to the other robberies that they were planning.

MR. DECKER: Judge, respectfully we would object to that proof.

THE COURT: All right. It's noted. And again, this is obviously not to determine the actual guilt of various offenses. The Court believes that some of this is important for the Court to be able to hear in aggravation. Proceed.

MR. DECKER:  We are, we are not objecting to the basis of the plea whatsoever.  He stands by his plea agreement.

THE COURT:  The Court understands that.  You're just objecting to this additional information.  Understood. Proceed.

MS. STERN:  At a minimum there was one particular message that defendant sent where he was showing a large amount of cash that he had from -- presumably from a robbery he had just committed.  And as to the other ones, it's unclear whether they were actually committed or just planned committed robberies, where he was sending messages about coordination essentially.

THE COURT:  All right.  Proceed.

MS. STERN:  Defendant's -- second, turning away from the actual -- the 5(k)2.13, more appropriately, this is considered under 3553(a).  Defendant's PTSD did not cause him to commit a kidnapping, and this is not an appropriate basis to depart from the guidelines.  Defendant was clearly in control throughout the entire kidnapping event.  Defendant helped plan the pre-kidnapping drug buy to confirm that they had a good target.  He coordinated the kidnapping vehicle.  He wore a suit and got a fake badge and handcuffs to make himself look more like a cop.

Defendant also was clearly aware that his actions were criminal in nature and wrong, as evidenced by the fact

that when he heard the police scanner broadcast that there was an abduction and that the police were onto his criminal conduct, he quickly got rid of the victim and fled the scene. This is not an instance of someone snapping because of an emotional -- uncontrollable emotional response. This is not an instance of someone's mental illness completely clouding their ability to -- ability to understand what was right and what was wrong.

This is someone who based on the character letters was able to and was functioning normally in society, but at the very same time chose to commit these violent crimes -- this violent crime. Excuse me. Defendant made a choice to conduct this kidnapping just as he made a choice in 2017 to reject therapy and medication for his PTSD. There were other options available for defendant, but defendant chose this path. And his attempts to mitigate his culpability by putting some of the blame for his actions on his PTSD is improper.

In addition, the government finds the defendant's unwillingness to own up to his actions and take responsibility disconcerting to the extent that it implicates an ongoing safety issue for the community. Defendant is apparently unwilling to recognize and understand his actions as wrongful and as his own actions. This is both true here and defendant's attempt to blame the PTSD for his conduct, but is also seen in other misrepresentations defendant made as part of his

sentencing process.

For example, defendant originally told Probation that in December of 2015 he opted to resign from the military to spend time with his children. This was not true. In fact, defendant had opted to resign rather than being eliminated after he admitted to using a government fuel card for his personal vehicle. Defendant also told the psychiatrist in this case that he was living in his vehicle and homeless at the time that he committed the kidnapping, leading to a level of desperation. This also was not true, and he later admitted to Probation that he had -- he had a job paying over $7,000 a month at the time that the kidnapping occurred and was living with his father.

These -- the lack -- defendant's lack of candor in these instances during the very serious process of sentencing related to why he does bad things is troubling because it begs to question whether defendant has actually accepted responsibility for his actions and has actually learned his lesson in this instance.

Finally, as to defendant's argument that he committed this robbery out of desperation and that warrants a departure from the guidelines, the facts do not support defendant's version of the offense, nor is this a basis for going significantly below the guidelines range. Defendant admits that at the time he committed the robbery he was employed, and

specifically employed by the Department of Commerce from 2018 to 2020. Defendant reported to Probation that he was making $7,750 a month while working for the Department of Commerce.

Additionally, it appears based on defendant's statements to Probation, that he was receiving $3,700 from the military as military benefits and as a person who is labeled 100 percent disabled from the time he was discharged from the military. Moreover, according to defendant, at this time when he was apparently receiving upwards of $10,000 monthly, he was also living with his father. Defendant has presented no reason why given his cash flow and living expenses he was nonetheless in such a desperate situation that it made it -- it made it seem like a violent crime was the only solution.

Given the nature and circumstances of the defendant's offense and accounting for defendant's personal mitigating circumstances -- characteristics, the government asks for a sentence of 87 months' imprisonment, which is at the low end of the guidelines range. Thank you.

THE COURT: It is indeed the bottom of the guidelines, correct?

MS. STERN: The bottom of the guideline, correct.

THE COURT: All right. Thank you very much, Miss Stern.

MS. STERN: Thank you, Your Honor.

THE COURT: All right. Defense, whenever you're

ready.

MR. DECKER:  Your Honor, my colleague Attorney Williams has a few witnesses she'd like to call in mitigation.

THE COURT:  All right.  Proceed.

MS. WILLIAMS:  There are things, Judge -- good morning.

THE COURT:  Good morning.

MS. WILLIAMS:  -- that I would like to address first regarding the government's position.

THE COURT:  Yes.  Go ahead.

MS. WILLIAMS:  And briefly.  The government states that there are more incidents of kidnappings.  There's text messages -- and we reviewed all the discovery.  There's text messages that aren't accounted for.  The facts surrounding -- and there's an individual that talked to the government that gave them information.  But in the text messages they aren't specifically talking about other kidnappings.  I think that it is misleading for the government to say that he's involved in other kidnappings when there's no evidence to suggest that.  He's here today for this case.

Judge, the government also points out that he fails to accept responsibility.  I don't think that's true at all.  He's changed his plea to guilty.  He's here in preparation to be sentenced for his role on the date of the incident.  He talked about in multiple documents that we've given to the

Court there was a period of homelessness.  He gets from the military.  There's an incident that took place in the military.  I want to point out that it's an honorable discharge, and he's a decorated soldier.

He's in the military.  There's an incident.  He gets out of the military.  It's not just that incident.  He did have issues with his children.  He went through a divorce.  He gets out to take care of his children.  There's no services right after leaving the military.  He is not working.  He was homeless.  He lived in his vehicle.  Yes, he went from pillar to post.  He went from his father's house, to his mother's house.  But all in all, he did not have his own residence.  He's trying to adjust back into society after serving our country.  So he made a decision, and it was an unfortunate decision.  And that's why we're here today.

I think the government is diminishing -- I'm sorry, Judge.

THE COURT:  No.  I'm just listening to what you're saying.  Are you -- you're saying that this all happened because he was homeless?

MS. WILLIAMS:  It stems from that.  Not only that he was homeless, he did suffer from posttraumatic stress disorder.

THE COURT:  Okay.  I just wanted to know what your -- where your argument was going.

MS. WILLIAMS:  Yes, Judge.

THE COURT: All right.

MS. WILLIAMS: And we submitted a report from Dr. Steven Farmilant. The government is saying, and I think it's also misleading to say that because an individual makes a conscious decision that they don't suffer from mental health issues. That is absolutely not true. That can impact their role in their decision making, and I think that's what happened here.

Judge, we have multiple individuals -- he submitted almost 20 letters. And I have a couple of people. I left my notes. I just want to give you who's speaking on his behalf. And I'm sure Your Honor read every letter.

THE COURT: Yes, I did.

MS. WILLIAMS: His mother, Beverly Booker is here to speak. Eli Williamson is also here to speak on his behalf. And they'll introduce themselves. Dr. Lance Williams and Lieutenant Colonel Giovannelli is here as well.

THE COURT: All right.

MS. WILLIAMS: Before I let them speak, Judge, I do want to note that Mr. Booker is not diminishing his role, nor is he not trying to take responsibility. Before this -- before he was arrested for this case, he started working for a violence prevention program called Acclivus, and this wasn't because he was arrested for this offense and he knew that this day would come.

That activity that happened on the date that we're here for today, he stopped.  He stopped committing crimes.  He started working for Acclivus.  He does have individuals from Acclivus today.  His boss is here as well.  The job -- he's been at the job the entire time.  He has a job still waiting for him if he is to be in custody.  They are more than willing and able to continue his employment, but they're here today to support him.

And so he didn't just get the job and try to help the community because he knew that this day would come.  This is who he is, as evidenced by multiple individuals, young teenagers that wrote letters about how he mentored them and wanted to help them.  And so I wanted to note that for the Court.

So I'll call first Beverly Booker, who is Mr. Booker's mother.  Where would you like for her to stand?

THE COURT:  She can come right to the podium.  Step right up, please, ma'am.  All right.

MS. BOOKER:  Good morning, Your Honor.

THE COURT:  Good morning.  All right.  I did see your letter.

MS. BOOKER:  No, I didn't --

THE COURT:  You did not write a letter?

MS. WILLIAMS:  Let her talk.

THE COURT:  Did you write a letter?  I thought I saw

a letter from his mother.

MS. BOOKER:  I did.

THE COURT:  All right.  So I do have a letter.  I did read it, but you can give a few statements, if you wish.  I would just say don't repeat everything that's in the letter.

MS. BOOKER:  Okay.

THE COURT:  All right.  Proceed.

MS. BOOKER:  Well, today I'm here to support my son.  This is an unfortunate situation, and I know challenges for everyone involved.  And as a 14-year-old mother, things were difficult.  But one of the things that I instilled -- or a few of the things that I instilled in my children were family, education, and a belief in God.

When Drake came back from the military, he was different.  During frequent visits to the house, where we would visit, he'd come by.  At that time he was working multiple jobs to take care of his children.  He would fall asleep sometimes, and I would notice his arms or his legs jerking --

THE COURT:  All right.  Whoever that is, you need to step out.  No taping of anything.  Everybody turn those phones off.  There can be no taping of these proceedings.

All right.  Proceed.

MS. BOOKER:  And when he would wake up, he would have this faraway look in his eyes, as though he didn't remember where he was.  Drake grew up in that house.  I knew then that

something was wrong.  There's not a father that I've seen more dedicated than my son.  He's gone through several custody battles to remain in their lives.  Every football game, T-ball, basketball game, he's attended.  He even, he even coached a few seasons to be mentors to other children that did not have male mentors.

As a result of his impactful parenting, my two oldest grandsons received overseas contracts.  One in the Republic of Georgia, and the other in Macedonia, Greece.  This is a direct result of my son's commitment and love for his children and his family.  It's already been mentioned that he works for a community gun violence prevention program, Acclivus.  I've gone by the office several times and, and observed and witnessed and participated with my son and his colleagues as they address issues of the community.  The location of his office is in Grand Crossing.  That's the same community that Drake was born in.

As a result of a few things, myself staying focused as a young person, both my son and I are college graduates.  During a recent 10-month period of unemployment for myself, which left me destitute and depressed, my son assured my safety, and he continues to provide financial and emotional support to me.  I do understand the depth and the brevity of what's going on today.  And if given the opportunity with his skills, his abilities, and his societal contributions, I think

those could be used in a different way.

With all due respect, Your Honor, I respect your decision, and I accept it.

THE COURT:  Thank you very much.  Anyone else?

MS. WILLIAMS:  Yes, Judge.  Thank you.  I would like to call Eli Williamson.

THE COURT:  Step up to the same podium.  All right. And he provided a letter also?

MR. WILLIAMSON:  Yes, ma'am.

MS. WILLIAMS:  Yes, Judge, he did.

THE COURT:  All right.  And if it's one of the letters I have, I have read it.  You can say a few words, and then also know that I have reviewed the letter.  All right. Proceed.

MR. WILLIAMSON:  Good morning, Your Honor.  My name is Eli Williamson.

THE COURT:  Yes.

MR. WILLIAMSON:  Just to let everybody know, I'm a combat veteran of 10 years.

THE COURT:  All right.

MR. WILLIAMSON:  Served in the United States Army. My job was psychological operations in the United States Army Special Operations, where I was also supporting all special operations units under JSOC, at that time the Bin Laden task force.  During my time --

THE COURT: Speak a little slower for the court reporter.

MR. WILLIAMSON: I'm sorry. Yes.

THE COURT: All right. Go ahead.

MR. WILLIAMSON: During my time in service, ma'am, I've done over a hundred combat missions. Most of those missions kill and capture. I want to apologize. I have a medical condition that takes constant monitoring. That was the beeping.

THE COURT: All right.

MR. WILLIAMSON: So I apologize for that.

THE COURT: No problem. Go ahead.

MR. WILLIAMSON: The reason that I'm here is not to talk about the letter, but to talk about I know it was -- a lot was talked about PTSD and the outcomes of PTSD. And for myself after getting, getting out of the military, one of the biggest outcomes of PTSD, posttraumatic stress disorder, and moral injury is behaviors that you would have that, you know, are seeking, you know, a rush. And myself I got back. I had started up a non-for-profit called Leave No Veteran Behind. We've been in operation for 15 years, and Drake Booker was one of the participants in that program.

So we do transitional jobs. We've provided Drake an opportunity to actually work with Homeland Security as an intern doing community resilience work. And so this risk

taking behavior, I understand it immensely.  Chicago, as you know, can be a pressure cooker.  And I come from the south side of Chicago, South Shore.  And I've had some very tough and difficult days as well.  I was very fortunate and very lucky to find individuals to contribute and to engage with me around other positive behaviors.  To include the care and welfare of veterans and youth.

Also Drake has not only helped our organization when he was at the census.  He's not only helped our organization with our community resilience work, but even before this incident, he has been doing work with our youth who have been participants in our program.

So, you know, I say all that to say this, I've had some very difficult days coming out of the military, and those difficult days don't always read easily, and they don't always fit the priorities and the, and the way in which we look at mental health issues.  So I'm very grateful to have Drake to participate in our program.  And whatever sentencing he gets, he knows that our organization will be there when he gets out.  He has a lot of skills that he's already applied for the betterment of the community.  And when he gets out, we want to make sure that those skills are being applied again.

THE COURT:  Thank you very much, Mr. Williamson.

MR. WILLIAMSON:  You're welcome.

THE COURT:  All right.  Thank you for your service.

MS. WILLIAMS:  Thank you, Judge.

THE COURT:  Yes.

MS. WILLIAMS:  I have Dr. Lance Williams.

THE COURT:  Step forward, sir.  Step right here.  You can put your -- wherever you need to put it.  Proceed.

DR. WILLIAMS:  Good morning, Your Honor, and court.

THE COURT:  Good morning.

DR. WILLIAMS:  So my name is Lance Williams, Professor of Urban Community Studies.

THE COURT:  From Northeastern.

DR. WILLIAMS:  Good morning.

THE COURT:  Yes.  I have it here.

DR. WILLIAMS:  Yes, so professor there.  Here in the City of Chicago in a program that's the No. 1 program in graduating African-American students in cultural studies. Drake is one of our students.  I'm here representing not only myself, but also the broader Northeastern community and students and African-American community in general.

I will say I know you read the letter.  I will say about Drake one funny thing.  You know, I've been teaching over 20 years, and I've never met a student in my 20 years who has invited their mom to class, and he was one of those students. And it really, it really was -- it took me aback because just his level of discipline and focus was just -- and as a student so eager to learn was to me just a joy to work with a young man

like himself.  To get a chance to meet his family.

I've had a chance to meet his children.  His son Jonathan, who I worked with and along with the family to help gain entrance into Chicago's -- one of most -- Chicago's most prestigious high schools in Jones College Prep, which, you know, these kind of schools in our city unfortunately are one of the few places where our students can go and get really quality education.

So I would just say in addition to the letter that I wrote, I'm also qualified as an expert in the fields of, of gang violence, violence in urban centers.  And I've been qualified in federal and local courts.  And I would just say, Your Honor, one of the things I think to keep in mind, which I'm sure you, you -- you will, is just the level of stress that occurs in our communities, particularly among young African-American males, Drake growing up in this city.  A great deal of stress created by things outside of the control of the community.

Issues of, of really bad housing policy.  Issues of really poor education.  Policy that has created a level of stress and desperation even at the highest level.  So even when we are working with young men who are college educated, degreed like a young man like Drake, we're still seeing these levels, astronomical levels of stress that cause acts of desperation. And I would just implore the Court to, to take that into

consideration in sentencing, to be as lenient as possible.

As you can see behind me, there's a whole community here representing him. And he's really an institution and, and someone in the community that we respect. And we hope that we can, you know, wrap our arms around him and his family and, and offer the most support possible. So I thank you for your time. And again, I just, just -- just implore you to just be as lenient as possible. Thank you.

THE COURT: Thank you very much for your presentation. Anyone else?

MS. WILLIAMS: Judge, finally we have Lieutenant Colonel Giovannelli. I do want to point out, though, that he did submit a letter. I don't know if it made it to the packet. But if -- he's here. If it's possible for him to speak.

THE COURT: He may speak.

MS. WILLIAMS: Thank you, Judge.

LT. COLONEL GIOVANNELLI: Good morning, Judge.

THE COURT: Good morning.

LT. COLONEL GIOVANNELLI: I'm Lt. Colonel Gerald Giovannelli. You have to give me some time. I've served our country for 28 years. I was the youngest lieutenant colonel in the Army. And I've judged the character traits and behaviors of men and women in combat operations against the enemy. Oftentimes them telling me they loved me as they spoke their last words. It's something about losing your life that makes

you tell people that you love them, they love you.  I don't know what it is.  I never figured it out.

I wouldn't be here today if it wasn't for Drake Booker.  I wouldn't be married still.  My kid, my one son Anthony wouldn't be No. 16 in the PGA Juniors if it wasn't for Drake.  Drake is the type of guy that I knew if I got in a tight spot in Afghanistan or Iraq, he would come pending he was alive.  And he did that to me when he came out of combat operations as well as a civilian.  I can't speak to what happened and why he's here today.  I wasn't there.  Of course, I would have been there for him and helped him make better choices.

But one incident that came up that was mentioned was about a gas card, and Drake was under my command.  Nobody will ever speak to the fact that he used his own personal resources many times and never got reimbursed or -- from the government, using his own vehicle and his own gas.  And the one time he uses the gas card, the people that didn't like him made sure that they made him an example.

The other thing people won't speak to is they'll talk about not getting treatment from the VA.  I don't get treatment from the VA because of my experiences at the VA and the way they treat you with medication and different things like that. My dad was diagnosed with dementia at 59 years old.  I questioned life ever since that.  He was my best man at my

wedding.  And if it wasn't for Drake, I probably would have taken my life a long time ago.  That's all I have to say, Your Honor.

THE COURT:  Thank you for being here and thank you for your service, sir.

LT. COLONEL GIOVANNELLI:  Thank you.

THE COURT:  Did he have a phone?  Yes, get your phone.

Anything else as far as witnesses to present, or are you ready to argue?

MS. WILLIAMS:  I'm ready to argue, Judge.

THE COURT:  All right.  Proceed, please.

MS. WILLIAMS:  Thank you.  So, Judge, I think our packet has -- we were detailed in our memorandum regarding our position in this matter.  Judge, we're asking the Court for a 15-month sentence.  Respectfully, Your Honor's discretion, we would honestly like a community based sentence for Mr. --

THE COURT:  Well, first of all, did your client do any time in custody?

MS. WILLIAMS:  No.

MR. DECKER:  Three days.

MS. WILLIAMS:  Three days.

THE COURT:  That's -- yes, thank you.

MS. WILLIAMS:  Sorry.

THE COURT:  Three days.  I'm sure you'll want that

counted if he does any more time.

MS. WILLIAMS:  Absolutely.

THE COURT:  So go ahead.

MS. WILLIAMS:  Three days.

THE COURT:  All right.

MS. WILLIAMS:  Since he's been out, and I know the Probation Department can speak for --

THE COURT:  And again, he's been out for how long?

MS. WILLIAMS:  I didn't calculate the exact time.

MR. DECKER:  Your Honor, it was May 6th of '22 when he was put on home detention after posting a $10,000 cash bail.

THE COURT:  All right.  Thank you.

MS. WILLIAMS:  Thank you.

MR. DECKER:  May 6th, '22.

MS. WILLIAMS:  He's been out since with no incidents, and Probation can speak to that.  I do want to point out in court he does have his three boys here.  If they can stand for the Court just to show.  They're college students.  Mom talked about the Republic of Georgia overseas.  There's a contract for Greece.  And then the minor, Jonathan Booker, who's 14 years old, he went to Jones.  He just recently transferred to Rich in the south suburbs.  And he plays basketball there, Judge.  He's also on the mock trial team.

And so, Judge, we're asking for him -- and I think what's paramount is that Jonathan graduates from high school in

two years, and he would like to be present for his high school graduation.  He's really the sole parent who provides for his children.  They reside with him.  And so, Judge, we're respectfully asking for the Court to consider who he is as a person.

THE COURT:  Wait a minute.  You're telling me that they reside with him and only him?

MS. WILLIAMS:  Correct.

THE COURT:  All right.

MS. WILLIAMS:  That is true.

THE COURT:  All right.

MS. WILLIAMS:  So we wrote --

THE COURT:  When you say "sole," I want to make sure I'm hearing.

MS. WILLIAMS:  It's sole.

THE COURT:  Sole.  Okay.

MS. WILLIAMS:  In the memorandum that we wrote Jonathan goes to his mom on the weekends.  Monday through Fridays he's with his father.

THE COURT:  All right.

MS. WILLIAMS:  Hospital visits, he's with his father. Educational visits, he's with his father.  Anything that happens, his father provides for him.  So that is correct, Your Honor.

THE COURT:  All right.  Go ahead.

MS. WILLIAMS:  If he were to leave, that would be a huge detriment to that minor.  Judge, so we're asking for 15 months.  Preferably a community based sentence on Mr. Booker's behalf, Judge.  Thank you.

THE COURT:  Thank you.

MS. WILLIAMS:  My co-counsel would like to follow up.

THE COURT:  Sure.  All right.

MR. DECKER:  Thank you very much, Your Honor.  And I don't want to be repetitive.  And with all due respect to the government, and I understand this is an adversarial process, but I think respectfully that the government has diminished, diminished the effect of PTSD on the conduct here.  And we would submit that his diagnosis, a hundred percent disability from the VA well before this happened, can certainly be an element and a circumstance the Court can take into consideration pursuant to the factors of 3553.

THE COURT:  Well, Counsel, you're saying the VA, which I just had a witness testify is not very attentive to his situation, but you want me to rely on their diagnosis and think that is important in your case, correct?

MR. DECKER:  Well, the diagnosis was a hundred percent disability.  What -- the issue that he had with the VA initially and why he did not pursue treatment only with the VA is that the doctors that he was dealing with there lacked the same experiences that he had.  By that I mean they weren't

combat veterans themselves.

Fortunately after the arrest, he's been getting treatment now, and he's been getting treatment from Dr. Hines, who had the same sort of background and knowledge and experienced some of the same experiences that Drake had.  And he found that much more beneficial in his treatment.  And he's been successful in his treatment.

But, but the factors that the Court needs to be aware of respectfully, and there's three, three dates of significance here.  All Americans remember September 11th.  But for Drake the key date in life was the very next day, September 12th.  That's the day that this man enlisted in the Army, September 12th of 2001.  When many of us Americans were in fear, disbelief, shock, he answered the call that so many didn't.  And not only did he answer that call, but he asked on his own to go to a certain division that was the most highly decorated division, and a division that was in charge of seeking out the enemy.  And that's the sacrifices that he made.

Now, how that all affects what happened on that next critical date, which was the date of the event that he pled guilty to, August 23rd of '18, I submit -- and it's not an excuse, but I would submit it's an explanation of how he got involved in this criminal activity.  He's not seeking to excuse it.  He's acknowledged by his plea of guilty.  But clearly those that suffer from PTSD can outwardly present themselves in

a respected normal appearance, but it's quite clear that those that suffer, and particularly those that suffer in the military, and it was addressed by the gentleman who talked to you before, that he seeks a pattern of stimulus seeking even after the traumatic events have ended.

Now, I know the government was trying to diminish the report of Dr. Farmilant. And I think he addressed those questions that the time that he was in the Army provided him great structure. If you don't follow the structure while you're in the Army, you're not going to survive. But while he was in the Army, he had the structure, and he was able to follow that structure. It was when he got out of the Army, a combination of a divorce, a combination of lack of income, a combination of how he was living, a combination of some of the factors that he had to deal with, led him to this entirely inappropriate risky, behavior.

I'm not excusing it, Your Honor, but I'm just trying to make an explanation of why someone like him, who -- a well-decorated veteran, and you've seen the number of accolades that he had. And I know Drake doesn't like to talk about his time in the service because it creates very strenuous emotions for him.

And I apologize also to his many friends and former Army colleagues that he had. I apologize for also repeating it. But I think it's important that when you serve your

country and you suffer from PTSD, I would submit that that then in this case, as documented by the report of the expert and pursuant to Section 3553(a), it does become a nature and circumstance of the offense that the Court can take into consideration.

The next date that I think is important for the Court to recognize is when the -- he was first requested and my first encounter with Drake was when a request for a DNA sample and hair sample was taken, and that was back on August 16th of '21. So that's three years, at least three years that he knew something was coming. The charges were filed March 21st of '22. And as I indicated, he appeared for his bond posting in May of '22.

So what has he done during that period of time? Well, fortunately, as I indicated, he finally was able to get the treatment that he needed from a doctor that he had an association with. You know, if you don't like your doctor, you're not going to follow their orders. But he has followed them. He's been able to adapt to that.

And then the final date of significance for him is going to be today. It's going to be today. On however you determine the proper disposition and the proper sentence of this case, I would only ask you to be aware of the issues that he had. His indispensable role that he has as a caregiver to his three boys. Also his age, 45. Statistics show that a

person of that age is unlikely to become a recidivist, who had no prior felony interaction.

Also mindful of the fact that forever he will be dealt with and considered as a felony federal background.  And also be mindful of the fact that it's not easy going to prison when you have a background as a police officer.  And he's not quite a police officer, but we know from his background he will have a little bit more challenging time than the regular prisoner simply because of his prior status.

He's shown remorse by his plea of guilty.  I'd ask you to be mindful of the fact that any psychological treatment and therapy he's going to get in the Bureau of Prisons will not be as good as he's getting now.  And if you minimize and seek a downward departure or variance or however it's considered now, we'd like him to get back to be able to continue with his therapy as quickly as possible.  Thank you very much for letting me address also.

THE COURT:  Thank you, Counsel, for your presentation.  Mr. Booker.

DEFENDANT BOOKER:  Yes, ma'am.

THE COURT:  You have the opportunity to address this Court on your own behalf.  And you may step up to the mic and do that now, if you wish to.

DEFENDANT BOOKER:  Absolutely.

THE COURT:  All right.  Whenever you're ready, you

can proceed.

DEFENDANT BOOKER:  I'm not sure if it's still morning, but greetings again, Your Honor.

THE COURT:  You're right on the edge.

DEFENDANT BOOKER:  All right.

THE COURT:  All right.

DEFENDANT BOOKER:  Before I really get into it, I would like to offer my condolences to the family and loved ones of Judge Leinenweber.

THE COURT:  I appreciate it.

DEFENDANT BOOKER:  I would like to move forward --

THE COURT:  Take your time.

DEFENDANT BOOKER:  I would like to move forward and thank the government for each entity of the government that I've interfaced with since this ordeal has transpired, and I thank them from the FBI agents, Agent Stadheim, the members of the Pretrial Services office, and then the initial prosecutor.

And the reason I want to extend gratitude to those individuals or those individual officers is because for me this is new.  I've heard horror stories, but it was never made -- I was never made to feel as though it was personal.  Everybody handled themselves with a high degree of professionalism.  And I was really appreciative of that.

My older two sons at the time that this transpired was '21, 2022, early on in my dealing with this legal matter,

they were collegiate basketball players.  I've never missed games.  Even in the military whether I was on TDY, I would fly home or fly to where they were playing.  And fortunately for me, each special request that was made to travel to see my sons play was granted.  And for me that was all I could ask for given this situation.

I would like to move forward to apologize to, to Mr. Lawrence, the victim in this matter and his family.  Also to my family for, for the action that I took on August 23rd, 2018.  I apologize to the Lawrence family because I know not what emotional or mental anguish he suffered stemming from that, his loved ones suffered stemming from that.  I can only imagine, and I'm deeply apologetic and regretful for putting his family through that.

On the opposite side is my family, my loved ones, who I've always vowed to care for.  I have them here in this position, and it's unfair to them.  Supporting my sons is all I ever wanted to do.  It's all I ever strived to do.  I entered the military for my sons and I exited for my sons.  I understand that the government presented a statement about my being dishonest with Miss Stern during my interview, but I was not dishonest with Miss Stern.

Granted there was a statement -- or there is a document stating that I signed my resignation in lieu of termination.  I had already signed a letter of resignation

because I was due to PCS, and PCS means I would leave the State of Illinois, leave the Chicagoland area and be assigned somewhere else. I had orders to go to a military school for six months, and then I would have a following assignment somewhere out of Chicago. I looked for ways to stay in Chicago or in the Chicagoland area, but the Army said that I was best suited in another region.

I resigned my commission because I had just underwent -- just gone through a divorce. I sought physical custody of my sons. I believe this was 2010, 2011, 2012. I kept petitioning for physical custody of my sons. I wasn't granted that. What I didn't want to do was have my sons growing up in the City of Chicago without their father being physical -- physically present.

So I didn't have a transition plan in place. I didn't have leave the military and move onto a career field. I struggled. Financially I struggled. I exhausted my savings to the point at which I became homeless. A lot of people may think homeless means living on the street. Those that experience homelessness are those that have no solid place, no steady place to reside. They can go from place to place, relative to relative.

It was very embarrassing for me, because I've always been in a position of the one that took care of everybody else. I lived in my van for seven months before I began to stay in

various people's homes a night here, a night there.  There are three people here today in my support that could attest to that.  I stayed in my brother's -- well, I'm sorry.  My culture, my community, I call -- I got a lot of brothers, but only two biological brothers.  So one of the nonbiological brothers, he allowed me to stay with his family.

My father, he allowed me to stay at his home.  And then my mother as well.  Now, of course, they would have taken me in, but it's like who I am, I can't sleep on somebody's couch.  I tried hard to find suitable employment to no avail until I landed a job with the Department of Commerce in late 2018, I believe it was.  And I understand that the government presented a statement saying that I made a particular amount of money.  I didn't receive my hundred percent disability until 2020, and that's when I began to get roughly 35, $3,700 a month.

In 2018 when I started with the Department of Commerce, the salary was well, but I had a whole lot of cleaning up to do from the previous years in which I was unemployed, in which I was homeless.  I was just at that point kind of getting my life together.  And all the while while I'm doing this, I'm taking care of my sons.  And at this time they were not -- excuse me.  At that time two of them were primarily with me because once they got into high school, they were mine a hundred percent.  They were mine.

And when I say that, it was me that served as a point person that got them to school.  Now, they did reside with their mom, but I would go pick them up and get them to school.  I stayed with them all while they were in practice.  I fed them after practice.  I commuted them back to their mom.  And it was I'd go to sleep in the van, and I'd go get them again at 7:00 o'clock the next morning.

The decisions that I made I'm extremely regretful for.  I knew that at some point I was going to have to atone for my act even before I received that call from Agent Stadheim.  Leading up to that event, I wasn't in my right state of mind.  And this isn't a cop-out.  It's reality.  I struggled.  I didn't necessarily realize how wrong I was in that action until I talked to one of my military mentors, and he wasn't onboard with me.  Not that I wanted him to -- well, he looked at me like, yo, that's not cool.

I looked at it like it was a mission.  I moved forward with the execution of the mission, and that's just what it was.  When my mentor talked to me about how that wasn't cool, he didn't just leave it at that.  He offered a point of contact for a therapist.  Suggested that I talk to her.  I told him that I wasn't comfortable with talking to the -- to those at the VA.  I wasn't comfortable talking to therapists because I felt very pacified in those situations where they would nod their head north/south with no relatability factors in place.

And Mr. Decker alluded to me not -- how I don't like to talk about my military -- or moments in the military service. I don't. Unless it's somebody that can truly relate. There are some things that I have suppressed that I don't want to feel again. But when my mentor suggested this -- a therapist who was also a combat veteran, I was open to it, and I was relieved that I did take him up on that suggestion. I began to feel better. I began to move in what I feel was a more productive fashion.

I began to volunteer in, in that same community that my mother spoke me being born in Grand Crossing. Me now working in Grand Crossing. The action -- or the act that took place August 2018 was actually in Grand Crossing. I volunteered with a agency that -- well, Acclivus, for a year before I was brought on staff. And I was comfortable with volunteering because it gave me a sense of purpose. I was helping a lot of at risk youth to avoid pitfalls that so many are plagued by in our communities. A pitfall that I fell victim to.

I wanted to let them know that, one, I understand. Two, I hear you. Three, there are other ways to avoid traveling down a life of crime. I love the work that I do. When the dust settles from this legal situation that I've placed myself in, I plan on returning to not only this community but other communities in the City of Chicago that are

plagued with just so many, so many young people that are without guidance and direction. I know I can help. I know I've had -- I've helped. I know I will continue to help whenever I return to these communities. I look forward to it. And it's a form of therapy. I know while I'm helping them, it's also helping me.

As a man, I stand before you extremely regretful for the decision that brought me here, that has all of us here. And I stand willing and ready to accept any punitive measures you deem appropriate for my actions.

THE COURT: Thank you very much, Mr. Booker.

DEFENDANT BOOKER: Thank you, Your Honor.

THE COURT: All right. You may have a seat. The Court is looking at the time. For my staff and myself, we're going to need some time to not only stand up, stretch, but also just make sure that I am able to contemplate fully before I go forward with my sentence for today, so I am going to take a break. And we'll start up at 1:00 o'clock sharp. 1:00 o'clock sharp. All right. Thank you very much.

(Said hearing was recessed at 12:11 p.m. until 1 p.m.)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,          )     No. 22 CR 156
                                   )
                 Plaintiff,        )
                                   )
        v.                         )     Chicago, Illinois
                                   )     November 1, 2024
DRAKE BOOKER,                      )     1:23 p.m.
                                   )
                 Defendant.        )     Sentencing Hearing

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SHARON JOHNSON COLEMAN

APPEARANCES:

For the Government:      HON. MORRIS PASQUAL,
                         Acting United States Attorney, by
                         MS. STEPHANIE C. STERN,
                         Assistant United States Attorney
                         219 South Dearborn Street
                         Suite 500
                         Chicago, Illinois  60604

For the Defendant:       LAW OFFICES OF STEVEN R. DECKER
                         900 West Jackson Boulevard
                         5E
                         Chicago, Illinois  60607
                         BY:  MR. STEVEN R. DECKER

                         ARI WILLIAMS LAW
                         4504 South Cottage Grove
                         Chicago, Illinois  60653
                         BY:  MS. ARIELLE WILLIAMS

U.S. PROBATION:          MS. MELISSA RAY


TRACEY DANA McCULLOUGH, CSR, RPR
Official Court Reporter
219 South Dearborn Street
Room 1232
Chicago, Illinois  60604
(312) 435-5570

(Proceedings held in open court:)

THE COURT:  All right.  The Court thanks everyone for its patience.  I thank all counsel and the Probation Department for your presentations, the witnesses who spoke, those who provided written information.  It is all helpful to this Court as I do the task that over my years on this bench has always been more difficult, and that is the task of sentencing another person.  It is never easy.  No matter what the offense was, it is never easy.  And this case is no different.

I am glad that I have the guidance of the Sentencing Commission, the sentencing calculations, the recommendations from Probation, and then again, the 3553(a) factors that have been discussed and referred to by counsel in this case.  That assists the Court.

So let me start out where I have to start out on every sentencing I do, and that is with the factor of the nature of the offense.  That's the first factor that's listed, and we would not be here if there had not been an offense that had been committed and that he had been convicted of.  I have to start there.  And as I start there, the Court's going to say, and I think it was clear from the government's presentation and even from the defense, the lack of objections to the PSI, the presentence investigation report, that this is a serious offense that he was convicted of, that he pled guilty to.

It was an offense that caused harm to obviously the victim, and it's an offense that could have caused harm to other people in the area nearby.  This incident, which he called "a mission," words of the defendant, basically was a situation where he and the people he was with took the law into their own hands.  They used law enforcement trappings in a neighborhood that was not really a stranger to victimization by law enforcement.  But took the law into their own hands, created their own situations, used the trappings of law enforcement to apprehend and transport their targets.

This posed a great danger to those victims, to people in the public, and even possibly to them themselves.  It's a serious crime.  The fact that it deserves a serious consequence is clear from the guidelines and how it is set up.  And I already talked about the guideline range that is in front this Court, and that's where I start before I move in any particular direction.  So I don't really think a lot more needs to be said as to the serious nature of this offense and why this Court takes it serious.

And I would also say, again, even making it more serious or -- not more, but giving more weight to the seriousness of it is the fact that he came from the community in which this matter was done, and a community that is already victimized and dealing with all kinds of crime, and he added to it.  For whatever the reason, he added to it.  And that makes

it very serious.

So that's the sentencing factor I look at first, and I rely on. I'm also going to rely heavily on another one of the sentencing factors, which is the character of the defendant, but I'll talk about that toward the end of my statements here today. I'm going to look at some of the other factors, which include making sure my sentence deals with respect for the law, which is really important here, particularly when defendant and his, his colleagues, for lack of a better word, were sort of trying to take that on themselves as part of their mission.

But it's important for me to make sure that this courtroom full of people understands that respect for the law is not the law in their minds. It's the law that we have on the books. That's the justice that I am seeking and looking at here.

Another factor is deterrence. Deterrence is two parts. Specific deterrence, meaning as to Mr. Booker. Trying to deter him from doing this again. And then there's deterrence to make sure that everyone here, young and older, understand this cannot be tolerated, this type of activity, and that there are consequences. Mr. Booker, that consideration is fairly short and sweet. Do I think that he will do this again? No, I do not. And I think the evidence is clear, and even the government did not make such an argument that he would not be

deterred.

And so specific deterrence is not on the table for this Court's real consideration. Public deterrence is because the action that was taken here, that he was convicted of is actions that cannot happen again for any reason. And people have to understand there are serious consequences to donning law enforcement outfits, to donning the titles and the -- all of the trappings of being law enforcement, and taking that upon yourself or going out and acting like law enforcement. There have to be consequences. That is serious. That's not Halloween. That is serious. And so I look at that as a serious factor that I have to consider, and it will have some play into what I decide.

I have to also look at rehabilitation prospects. And I can rely on the fact that he didn't have any problems while he was out on pretrial release. That is really important. That he was able to do a lot of good while he was out on pretrial release, which is evidenced by many of you who are here. That he had no issues that he had to appear in front of the Court, trial Court for while he was out on pretrial release. That is all very positive as to him being rehabilitated during this time. The Court does not, again, have to really worry about him doing other criminal activity after this experience. So that is something that I look at.

And I also look at the rehabilitation prospect that

I'm assuming are, are shown by the presence of you all here. That he's going to have a lot of support in the community. That he will have jobs.  He'll have volunteer opportunities just like he's already taken advantage of those, and he'll have people who show him the love that you have shown him by being here today.  And so that is something that this Court looks at also.

So I'm going to circle back to other important factors, and that is his own background, his own nature and circumstances of his history, of his background, and the people who have talked for him and spoken for him about his history. Including first and foremost his mother who stepped up, Miss Booker, where she talked about not only his importance in her life, but what's more important to the Court is her statement about how he grew up with a very young mother, a 14-year-old mother, still a child herself.  Not able to give him the kind of family unit and experience that she might have liked to. She looks back on and she probably said I wish I could have.  I didn't know better.  He ended up having trauma with his father. The Court understands that.  All of that I take that in consideration.

As to the not having a set family unit, not that anybody has a perfect family, but not having that available to you as you were growing up, that can be something that the Court has to rely on and look at as possibly being -- putting

you in situations where you might not have made the best decisions that you could have.  So that's part of your early life that I look at.  You did still manage to get high school and you managed to even get into college.  But then the family came, and all that went off the rails for a while, and the Court understands all of that, and I've looked at that.

I do note you have your sons here.  And three young men, and that you I think can be quite proud of and clearly have benefited from your parenthood and the fact that you've been there for them, and that's very positive on your role in their life and the fact that you undertook that.  Also the letter even from your ex-wife was positive, and she gives you credit for the job you have done.

I will say this:  That clearly if they are still with her, especially the younger son -- not now but was for a long time still living with her, while you did your father things of going to games and picking them up and being there for them, but clearly she had a role, which sounds like it was pretty minimized by what was presented here to me.  She clearly did something right, because when you have a family that is broken apart, you can't have one person -- or I hear about it usually if one side is so bad that they contributed to some of the problems that went on here.

That is not the case.  These young men seem to be strong young men based on your pride in them and based on what

has been presented with them. So I just think that that needs to be said. And you also were in the military, so at least for some of the time you were away until you were able to figure out a way to be closer to your family. So we need to give some credit where credit is due, and I give that to her.

But when it comes time to sentencing, I will tell you this: Families, whether it's parents, whether it's children, relatives on the side, I call them, for lack of a better term, collateral damage. I have to say that. Because as a person, which I am under this robe, I would have feelings for every family that comes in front of me, whether they have one person in court or a whole courtroom full of people. They have relatives, they have grandparents, they have children that are going to suffer from them being away for any amount of time.

And so I cannot have that -- and that includes births, weddings, graduations. I cannot have that in the forefront of my mind when I sentence someone, otherwise no one would ever be sentenced, or I'd just be a mess. So I handle a lot of criminal cases of all kinds, and I've sentenced a lot of people. And that is something I look at, yes. But I cannot give it strong consideration to the time that I am going to consider.

So now that you've heard that, I get to the -- one of the -- a couple of things. First of all, a major plus in mitigation for you, sir, is indeed your service to our country.

And it is not just signing up.  It is being in combat.  It is signing up during the most dangerous time, one of the most dangerous times in our country, and serving with all kinds of commendations and with all kinds of accolades.  And the Court salutes you and your band of brothers and sisters who may be here in this courtroom for the service you have performed.  And I don't take it lightly that that has happened, and I also don't take lightly that you suffered trauma from those experiences.  I don't take that lightly at all.

In fact, your lawyer -- one of your lawyers, Miss Williams can tell you that I am part of Reentry Court in this courthouse.  I deal with veterans, people with mental health issues all the time.  They are my specialty.  And so, you know, it is not something that I take lightly at all.  I hear all of it.  And I've also dealt with Reentry because there are people who have had those problems who have gone into custody.  They did not get to go and be in the community first.  They went into custody, and then they came out and we are helping them deal with the problems that they have on the outside.  That's always a program, but that's something I take into consideration.

The PTSD, as to what role it played in your activity here, I'm not an expert.  The Court understands that you have professionals who have made you think and caused you to think, and maybe rightly so, that this might have caused part of your

issue, and that could be.  I am not going to make a definitive statement here because I don't think I have the information that would allow me to do that at this point, to say PTSD caused this.  I can't do that.  What I can do is understand that any type of sentence I give might exacerbate whatever condition you've been diagnosed with, and I will take that into consideration.

Having said all of that and looked at all the factors that have been presented to me and all the ones that I need to look at under 3553(a), including -- and let me go to this too -- including your allocution, sir, which I will say was very articulate, very direct.  The Court appreciated it, especially your apology to your family, because that's always something that needs to be done.  Because as I say, I think the family suffers as much, if not more.  And your apology to the family of the victim here.  Because you're right, I don't think anyone will ever know what that experience did to that person. And because they have to be considered as a person, you know.

If somebody gets puts in a position where they are abducted and, you know, put in a situation where they don't know if they're going to come out of it okay, alive, in one piece, that's something, as you say, even from your time in the military, that affects people.  And so the fact that you apologized to that family, because they're going to be affected too, was a good thing.

Your seeming to understand and give credit to how the government, the prosecution treated you throughout this, the Court finds that admirable that you acknowledge that.  Because there are -- I will say this:  There are many people who sit in the area you sit in that can't say that same thing.  They will not give that same kind of credit to the government that puts them in that position.  Everybody doesn't get that same treatment.  And I'm certain that some of it probably happened, again, because of your service and because of the way you handle yourself.  And so all those things are good checks on your ledger.

But again, this Court starts out with a range in front of me.  The range is 87 months to 108 months in prison.  The government has asked for the bottom of the guidelines.  I can go anywhere within that, that area or below that.  Your side has asked for 15 months.  The recommendation from Probation is 40 months.  This Court looks at other cases and sentences sometimes to give me guidance.  Again, I also take into consideration that those cases, those situations were taken into consideration when the guidelines were created and when the recommendations were made by the various parties.  I'm certain that your lawyers, I would hope, looked at other cases to see where you might have fallen in this situation.

But I will say this:  For my 15 years almost on the bench, and I have handled quite a few of the criminal cases,

some of them big, still handling some of those, I will say that this case is very unique in its factual circumstances. Trying to look for something that was similar, it was hard to find something quite similar to this case. You know, I've had experience with the stash house cases and the whole issues about stash houses. I have my own opinions on stash house cases. I understand that. I also understand the danger that can be caused to people of color because of stash house cases.

I also understand the danger that can happen because we put people even in the situation to go to a stash house case. There are many levels of that. And then I've seen people suffer because of the stash house prosecutions. I understand all of that. And so, you know, I also understand -- coming from that point, I also understand being from a south side community, being from the Grand Crossing area, being from knowing the southeast side. I know the area. I know where the people you're talking about come from. And it's not a long time ago that I was there. And so this is -- everything I take in consideration when I reach a decision in this case.

But to make sure not only that there is a deterrence here, particularly a public deterrence, that people understand there are consequences to, to this type of activity, but also giving some -- much credit to your service and the good that you have done since being out and around, this Court is going to issue a sentence of 42 months in custody. With four years

of supervised release and a hundred dollar special assessment. There will be no restitution. There will be no fine. I'll go over the conditions for supervised release in just a moment.

Is there anything else from the government?

MS. STERN: The government moves to dismiss Count 2 of the indictment.

THE COURT: Any objection?

MR. DECKER: No, Your Honor.

MS. WILLIAMS: No objection.

THE COURT: All right. There being no objection, that is dismissed. We ready to talk about supervision conditions?

MS. STERN: Yes, Your Honor.

MS. WILLIAMS: Yes, Your Honor.

THE COURT: All right. All the conditions on supervised release, sir, I'm going to go through these as quickly as I can. I will tell you, supervised release happens after you're released from custody. Once you're released from custody, we have supervised release. You will be under the supervision of the Court, making sure that you handle certain conditions. For the most part, these conditions are in place to help you transition back into society. You're going to have all the help from people out here and your various organizations and your colleagues, yes. But as your counsel has talked about, you will have the label of convicted felon on

you forever.  And sometimes that is an impediment to being able to move forward.

And so hopefully some of these conditions will help ensure that you can move forward and do that.  And I will tell you upfront based on your history, I would expect this to happen where you would -- your lawyer would say that he's doing such a good job, Judge, can you terminate him off of supervised release earlier?  It's always that opportunity to have an earlier termination based on the good work that you're doing or the improvements you're making where you will not necessarily be on supervised release for the whole four years.

So supervised release requires, first of all, that when you are released from custody, that within 72 hours you have to appear to the probation officer and make sure that you check in with them and give them your background or your contact information and review your conditions on supervised release.  Do you understand?

DEFENDANT BOOKER:  Yes, ma'am.

THE COURT:  Sir, there are several sections of supervised release.  They have different categories, and all of them -- first of all, the Court is going to say that I'm considering with 3553(a) factors in mind.  And the first section is mandatory.  The second is discretionary.  And then there is special conditions.  But for you every condition is mandatory.  Do you understand?

DEFENDANT BOOKER:  Yes, ma'am.

THE COURT:  The mandatory conditions in the first section are that you will not commit another federal, state, or local crime.  You will not unlawfully possess a controlled substance.  You will cooperate in the collection of the DNA sample, if one is requested of you and required by law.  I do have here No. 6, Probation.  I'm going to keep this with refraining from any unlawful use of controlled substance and submit to one drug test in the 15 days of release.  And if he gets one and the first one is negative, which seems to be in keeping with what I'm seeing in his background, I am not going to require that he have any more after that.  Only that it will be at Probation's discretion.

So you will not be under a regular drug drop protocol unless Probation requires it.  I'm not going to require it in these conditions.  Understood, Probation?

MS. RAY:  Yes, Your Honor.

THE COURT:  Any objection from the government?

MS. STERN:  No, Your Honor.

THE COURT:  Any objection from defense?

MS. WILLIAMS:  No, Your Honor.

THE COURT:  All right.  Those are the mandatory conditions, sir.

Discretionary conditions:  You will provide financial support to any dependents, if you are financially able to do

so. You will seek and work conscientiously at lawful employment, or if you are not gainfully employed, you shall pursue or continue to pursue a course of study or vocational training that will equip you for employment. You will not communicate with the people whom you know to be engaged in or planning to be engaged in criminal activity. Specifically, Cedric Williams, Torino Williams, Charles Lawrence. But with anyone who you know is planning to be involved in a crime. Do you understand?

You have a question on that, talk to your lawyer first.

(Defendant conferring with his counsel.)

MS. WILLIAMS: Judge, if I may.

THE COURT: Yes.

MS. WILLIAMS: So there is an individual that you named.

THE COURT: Yes.

MS. WILLIAMS: Torino Williams.

THE COURT: Yes.

MS. WILLIAMS: After looking at all of the discovery -- and we've let the government know that we had an objection to this as well. So in the plea agreement and all of the discovery Torino Williams' name is never in there. He's not charged in this incident. His name is never mentioned by the source that they got the information from. He's not in any

videos.  Out of the blue, the government has a statement of facts.  In their statement of facts is that Torino Williams is also involved.  We've already talked to them about that.  He -- there's nothing that supports that.

THE COURT:  Okay.  Hold up one second.  So is Torino Williams connected at all with Cedric Williams?

MS. WILLIAMS:  That's his brother.

THE COURT:  Okay.  They're brothers.  Okay.  So, government, do you have an objection to that being removed?  Is there any basis for -- in your minds for Torino Williams to be included?

MS. STERN:  To be honest, Your Honor, I'd have to rely on the government's version of the offense, where the government asserted that beginning in -- that both Williams brothers were part of the same crew of kidnapping victims or -- kidnapping, kidnapping and robbery crew.  I was not aware of this objection.  Perhaps it was presented to the prior prosecutor.  I'm not sure.  So I'm just unfortunately not prepared to provide evidence.

THE COURT:  No.  No.  Thank you, Miss Stern, for that.  So I guess basically, sir, I mean, I have no problem with removing the name based on what you said, but it's still -- my, my conditions still stand.  Whether it's any of these people -- say, let's take Torino Williams out.  If his brother or anybody, his cousin, his significant other, anybody

who's related to any of these people or anybody else that you know is planning an offense, then you should not have contact with them. Do you understand? While you're on supervised release. What you do after that, that's not on me.

DEFENDANT BOOKER: I understand.

THE COURT: Understand?

DEFENDANT BOOKER: Yes, Your Honor.

THE COURT: All right. So --

MS. WILLIAMS: And, Judge, I'm sorry. I just wanted to let the Court know for the record, we're, we're -- we respect that, and we're not objecting to him. He's not planning on engaging in any unlawful activity. It's just that person specifically --

THE COURT: Yes.

MS. WILLIAMS: -- we don't have any inclination that he's actually even involved in any criminal activity.

THE COURT: And again, based on what you're saying and the fact that Miss Stern doesn't have the up to date -- I mean, I understand we've had several prosecutors here too. That she right now doesn't have that knowledge, I don't mind Probation removing that name from there.

MS. WILLIAMS: Yes, Judge.

THE COURT: But what's more important is not the name. It's that whoever you're around, even if we don't know their names right now, if you're around someone who you know is

planning to get involved with a crime, then you need to stay away from them.  Because if you go near them, then you're going to be in violation.  Do you understand?

DEFENDANT BOOKER:  Yes, Your Honor.

THE COURT:  So it's not a name thing.  It's a purpose thing.

MS. WILLIAMS:  Thank you, Judge.

THE COURT:  And then No. 7, you will refrain from, it says, any use of alcohol.  And do you call yourself an alcoholic?

DEFENDANT BOOKER:  No, Your Honor, I don't.

THE COURT:  I mean, I know you talked about it at one point.  I guess I -- what I, what I don't want to say is, so I can tell you to refrain from the use of alcohol, but you're over 21, so alcohol is legal for you, unless what I have had is people who acknowledge they are alcoholics.  And so if so, then I would just say any.  But if you're saying, no, you don't call yourself that, despite the fact that you used to drink quite a lot until you got some help, if you don't call yourself that, then right now I'm just going to put it on excessive use of alcohol.

And I define that as having a blood alcohol concentration of .08 or greater, which means that you don't drink and get behind the wheel of a car.  You don't drink to that excess and walk on the public roadway.  You don't drink

and get into any type of altercations and be at that level. Then that will be a bridge too far with drinking. Do you understand?

DEFENDANT BOOKER: Yes, Your Honor.

THE COURT: All right. Any objection to that defense?

MS. WILLIAMS: No objection.

THE COURT: Government.

MS. STERN: No, Your Honor.

THE COURT: All right. You will not possess a firearm, destructive device, or any other dangerous weapon. You will participate in -- at the direction of Probation in a substance abuse assessment. Assessment. Not a treatment program, but an assessment. So that's when you get out, they'll have an assessment for you to do. And however it comes out, you agree to participate according to the assessment. Do you understand?

DEFENDANT BOOKER: Yes, Your Honor.

THE COURT: Then also you will participate in a mental health assessment. And then whatever programs they have suggested for you based on that assessment, which would include any PTSD counseling, any other counseling, maybe family counseling as you put your family back together, all of that you will participate as directed during that time period. Do you understand?

DEFENDANT BOOKER:  Yes, Your Honor.

THE COURT:  You will not knowingly leave from the jurisdiction where you are being supervised.  If it's in this jurisdiction, the Northern District of Illinois, there's like 12 counties that you can move around in without asking for permission.  They'll be listed there.  If you're in some other location, you'll know from their direction what your parameters are, where you don't need to ask for Probation's permission or the Court's permission.

But in general you will be confined to a certain area to move around in once you're released from custody, and then you cannot go beyond that.  Meaning you can't cross -- if you're in Illinois, you can't go over to Hammond to get gas.  You can't go over to the Gurnee shopping mall.  You can't go to Indiana.  You can't go to Iowa.  Those places you cannot go without seeking permission of the Court first.  Do you understand?

DEFENDANT BOOKER:  Yes, Your Honor.

THE COURT:  That includes for jobs or anything like that.  If you get a job somewhere, then you need to ask permission.  Probation will go before the Court and will have a talk with the lawyer and the prosecutor, and we'll figure out a way to make any type of special arrangements happen.  Do you understand?

DEFENDANT BOOKER:  Yes, Your Honor.

THE COURT: Probation officer will be permitted to visit you at any reasonable time, and that's reasonable, which is set forth between you and Probation, if everything has been going well, which means they're not going to knock at your door at one o'clock in the morning. They're not going to knock at your door at 10:00 o'clock at night. They're not going to pop up to wherever your job is. That's not going to happen. Do you understand?

DEFENDANT BOOKER: Yes, Your Honor.

THE COURT: So it's a reasonable time and a reasonable location. So, Probation, you can take off of home. You can off of work. You can take off of school and community service. Do you understand?

MS. RAY: Yes, Your Honor.

THE COURT: All right. Reasonable location is the key. Any objections from the government?

MS. STERN: No, Your Honor.

THE COURT: Any objections from defense?

MS. WILLIAMS: No, Your Honor.

THE COURT: All right. That will be the requirement. Also, though, if based on what I've set forth in this order there is contraband that they see, contraband meaning weapons, gun -- drug paraphernalia, in your case any type of law enforcement paraphernalia that you should not have, if they see that, then they get to grab it. Do you understand?

DEFENDANT BOOKER:  Yes, Your Honor.

THE COURT:  All right.  No questions asked.  They get to take it, and they'll talk about it later.  You also have to let Probation know within 72 hours if there's any change to your residence, your employer, your workplace, your community service, if you're doing some somewhere.  But you need to let them know what that is.  Because if you don't, they will get an alert, and they will know about it first.  And you don't want that to be the order.  It should be you telling them first, not them telling you -- or telling on you.  Do you understand?

DEFENDANT BOOKER:  Yes, Your Honor.

THE COURT:  All right.  You also need to, sir, notify them if you have any connection with law enforcement.  Meaning traffic ticket, asking directions, which they don't do anymore, because everybody has a GPS.  But if you're questioned in any way, shape, or form by law enforcement, even if it's just a conversation, you need to go from that conversation directly to calling Probation saying, hey, I just talked to officer so and so or agent so and so.  He saw me.  I asked him how his kids were.  That's the conversation you need to tell them about, and then the next call is to who?  After Probation, who's your next --

DEFENDANT BOOKER:  To my --

THE COURT:  -- call to?

DEFENDANT BOOKER:  To my attorney.

THE COURT: Yes. Yes. Okay. And tell your attorney I just called Probation because of this. Again, you want to be driving how they're informed. Okay.

DEFENDANT BOOKER: Yes, ma'am.

THE COURT: All right. Any objection to that, government?

MS. STERN: No, Your Honor.

THE COURT: Any from defense?

MS. WILLIAMS: No, Your Honor.

MR. DECKER: No.

THE COURT: All right. Probation understands?

MS. RAY: Yes, Judge.

THE COURT: All right. Thank you. Then also if Probation asks you any questions, you should answer their questions truthfully. What's going on in your life. If they ask you a question of: Wait. Did I see you at such and such near this person -- near this Williams person that you're not supposed to be around, answer them truthfully. Talk to them, or say I need to talk to my lawyer.

All right. There is another discretionary requirement that I'm going to go through. It's No. 24. Is there an objection defense? You shall submit your person, property, house, residence, vehicle, papers, office to a search.

MR. DECKER: As long as consistent with at reasonable

times.

MS. WILLIAMS:  I mean, the, the amount.  Is there a way that we can limit the amount of searches?

THE COURT:  Well, by limiting, you mean like where they can search?

MS. WILLIAMS:  Well, just --

THE COURT:  Okay.  Let me just say this:  The reason I asked you this is because I always have a problem with this one.  So you shall submit your person, and you can get rid of property -- well, you can leave property there because that could be for a car.  But person, property, residence, and you leave vehicle.  Those can remain there.  For a search conducted -- and if you wish, I will say that for the first two years on supervised release.  And they will be, therefore, searched, and that will be -- usually it only happens if they have some inkling that there should be a search.  Like there's some information they have that they need to check out.  All right.

Am I correct, Probation?

MS. RAY:  You are, Your Honor.  And there has to be -- it's a reasonable suspicion standard.

THE COURT:  It's got to be a reasonable suspicion.  All right.  There's just a lot there, and I usually expect defense attorneys to object, and I usually adjust it.  Any objection to my explanation from the government?

MS. STERN:  No, Your Honor.

THE COURT:  All right.  Any further objection from defense?

MS. WILLIAMS:  No, Your Honor.

THE COURT:  All right.  Again, that's for a 24-month period, 2-year period.  And then if everything is going well, then that will not be part of his conditions.  And then I will move on.  And those conditions, both the mandatory and the discretionary were with 3553(a) considerations in mind.

All right.  I'm going to the last section, special conditions.  Sir, if are unemployed for the first 60 days of your supervision or if you're unemployed -- if you like get a job and then for some reason all of a sudden you're unemployed for another 60 days, you're laid off or something, then you have to start doing community service for 20 hours a week.  So that 20 hours a week is enough time for you to keep looking for a job, to be able to move onto something else.

If you get a job after you've been off -- out of work for 60 days and all of a sudden within the next 2 weeks after that 60 days goes by, you started your community service and then all of a sudden you get a job, you do not have to continue community service.  Do you understand?

DEFENDANT BOOKER:  Yes, Your Honor.

THE COURT:  So as long as you have a regular job, you will not have to do community service.  If you don't have a

regular job, then you have to do community service, and it will not exceed a total of 400 hours, which means, you know, again, community service 8 hours a day, you can do 20 hours in a week -- in a weekend. All right. So that's community service. And you can go right now to places that you have served before. There's no reason why you cannot do community service there. Do you understand?

DEFENDANT BOOKER: Yes, Your Honor.

THE COURT: All right. Anything on that from the government or defendants?

MS. STERN: No, Your Honor.

MS. WILLIAMS: No, Your Honor.

MR. DECKER: No.

THE COURT: Probation understood?

MS. RAY: Yes, Your Honor.

THE COURT: All right. Thank you. All right. Then I'm also looking at -- since we don't have any restitution here, I'm not going to go into 5 and 6. All right. And so that's the credit checks and whatnot. Obviously even No. 8 is still abiding by the law, so he has to file income tax returns when required by law.

MS. RAY: Your Honor, I would also say that special condition No. 7 may be irrelevant given the lack of restitution.

THE COURT: I agree. 5, 6, and 7 since there is no

restitution, those will not be given.  Unless the government is filing objection to that.

MS. STERN:  No objection.

THE COURT:  All right.  So special conditions right now we talked about is No. 3 and then No. 8 and then No. 11.  You will not enter into any agreement to act as an informer or special agent of law enforcement without prior permission of the Court.  Do you understand?

DEFENDANT BOOKER:  Absolutely.

THE COURT:  Oh, good.  I'm glad.  I'm glad.  Also one more.  You shall observe one Reentry Court session.  I didn't say you have to join Reentry Court, but you have to observe.  We do them twice a month.  They're open to the public, but you would have to come in and check in and say I'm coming to watch.  My courtroom when I'm in Reentry, it doesn't even look like this.  It's totally set up differently.  It's a different thing.  You can talk to other people.  It's becoming pretty well known in the community about what we do in those sessions.  So you're required to observe one session.  If you apply and join Reentry Court, that will be between you and the Court as to what happens with that.  Do you understand?

DEFENDANT BOOKER:  Yes, Your Honor.

THE COURT:  All right.  I believe on conditions, have I given them all, Probation?

MS. RAY:  You have, Judge.

THE COURT:  All right.  Anything further from the government?

MS. STERN:  No, Your Honor.

THE COURT:  Anything further on conditions from defense?

MS. WILLIAMS:  No, Your Honor.

THE COURT:  Understanding, again, that I consider all of these under 3553(a) factor consideration.  Anything further from the government?

MS. STERN:  No.  I think just --

THE COURT:  Well, yes, I know about the other.  But from the government.

MS. STERN:  No, Your Honor.

THE COURT:  Anything further from defendants at this point?  And as I'm waiting to see, do you have a position on where he would like to be placed?

MR. DECKER:  We, we had made the request for Oxford.

THE COURT:  All right.

MS. WILLIAMS:  That is correct, Your Honor.

THE COURT:  All right.  The Court will make the request.  Again, I can only make a request, sir.  I don't have the authority to place you.  That's the Bureau of Prisons that decides where you go.  Obviously you'll get, get credit for the time you did do.  I think it was three days that you did do.  You'll get credit for that.  And I will ask and recommend

Oxford for you.

Sir, you have a right to appeal this Court's decision. You have 14 days to file a notice of appeal. Your lawyers will talk to you more about that when we leave here as soon as we can. What about a report date?

MR. DECKER: Your Honor, the defendant has been released from a $10,000 cash bond that he posted on, on or about May 6th. May I ask for a self-surrender date a month or so from now?

MS. STERN: After the holidays, Judge, is what we're really looking forward to.

THE COURT: All right. Well, before you get that, first of all, Probation, do you have a recommendation on that?

MS. RAY: Your Honor, I did speak with Christa Green, who is supervising the defendant. She has no objection to self-surrender. Anecdotally, it's been my experience about six to seven weeks is how long the Bureau of Prisons is taking for designation.

THE COURT: All right. Thank you. Anything from the government on this as far as whether or not he gets to stay out while he waits to report?

MS. STERN: No, Your Honor.

THE COURT: All right. Then if there's no problem with that, sir, you'll be under the same conditions you've been under, and the Court is looking at -- let's do mid-January.

THE CLERK:  January 15th.

THE COURT:  January 15th, that's the date I'm looking at.  Is that a problem?

MS. WILLIAMS:  I do -- no, there's no problem.  We don't have to be here.  I do have a question, though, after you --

THE COURT:  No.  No.  Well, first of all, you won't be here.

MS. WILLIAMS:  I know.  I know.  I had to correct myself.  January 15th is fine.

THE COURT:  Well, no.  No.  I meant he'll be designated.  He'll go right to the designation.

MS. WILLIAMS:  January 15th.

THE COURT:  He's not coming here.

MS. WILLIAMS:  January 15th.

THE COURT:  Yes.  Okay.  All right.  So January 15th gives him a couple of holidays.  Is there anything else?

MR. DECKER:  Judge, after the government receives that confirmation that he's surrendered, I guess we can motion up our motion to exonerate the bond that he posted.  We're not asking for that now.

THE COURT:  Yes, sure.  You can do that.  And anytime you believe it's appropriate, yes, do it.  And I will -- we don't have to come into court.  I will take care of it unless there's an objection.

All right.  Anything else from the government?

MS. STERN:  No, Your Honor.

THE COURT:  Anything else from defense?

MS. WILLIAMS:  Judge, briefly --

MR. DECKER:  Thank you for your consideration.

MS. WILLIAMS:  Briefly.  Judge, there is a GPS monitor on him.  I know there's a bond.  He's pled guilty.  You gave him his sentence.  There's a surrender date.  Would the Court be opposed to removing that GPS monitor?

THE COURT:  Did Miss Green talk about that GPS monitor?

MS. RAY:  She did not, Your Honor.  I can send her a quick e-mail if Your Honor --

THE COURT:  Send her a quick e-mail, please.  Thank you.

MS. WILLIAMS:  Thank you, Judge.

THE COURT:  You're welcome.  He's also in a different position than he was before.  He's now convicted, and he has a sentence and he has a time that he's going to be in custody.  We're in a little bit different position.

MS. WILLIAMS:  Yes, Judge.

THE COURT:  All right.  So she can look for that.  And when we hear from that, if you want to wait around, take your time waiting around.  I mean, I'll still be here.  I'm not leaving right away.  All right.  So we'll get that cleared up

before you leave here today.  All right.  Anything else from anyone?  If not, I appreciate all the support that you have given as a community.  Thank you.

MS. WILLIAMS:  Thank you, Judge.

MR. DECKER:  Thank you.

(End of proceedings.)

CERTIFICATE

I HEREBY CERTIFY that the foregoing is a true, correct and complete transcript of the proceedings had at the hearing of the aforementioned cause on the day and date hereof.

/s/TRACEY D. McCULLOUGH                    January 17, 2025

Official Court Reporter                              Date
United States District Court
Northern District of Illinois
Eastern Division